# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs May 21, 2002

## STATE OF TENNESSEE v. RALPH TAYLOR HOPSON

**Direct Appeal from the Criminal Court for Claiborne County**
**No. 11331     E. Shane Sexton, Judge**

**No. E2001-02113-CCA-R3-CD**
**October 2, 2002**

Defendant, Ralph Taylor Hopson, was indicted by the Grand Jury of Claiborne County for one count of second degree murder and one count of attempted second degree murder. Prior to trial, Defendant stated his desire to waive his right to representation by counsel and requested to proceed pro se. Four days later, the trial court conducted an inquiry into Defendant's ability to represent himself and granted his request. Following a jury trial, Defendant was convicted of the offenses charged. The trial court subsequently sentenced Defendant to twenty-five years for the second degree murder conviction and ten years for the attempt conviction, to be served concurrently. In this appeal, Defendant challenges both convictions on the ground that the waiver of his right to counsel was not knowingly and intelligently made. In addition, Defendant contends that his sentence for the second degree murder conviction is excessive. After a review of the record and applicable law, we conclude that Defendant did not knowingly and intelligently waive his right to counsel and that the trial court erred in determining Defendant's sentences. Accordingly, we reverse the judgments of the trial court and remand this matter for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed.**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Julie A. Rice, Knoxville, Tennessee (on appeal only); Ralph Taylor Hopson, *pro se*, (at trial); and Martha J. Yoakum, District Public Defender; and Charles A. Herman, Assistant Public Defender, Jacksboro, Tennessee (at trial as advisory counsel) for the appellant, Ralph Taylor Hopson.

Paul G. Summers, Attorney General and Reporter; Peter M. Coughlan, Assistant Attorney General; William Paul Phillips, District Attorney General; Jared Effler, Assistant District Attorney General; John Arnold Steakley, Assistant District Attorney General; and Todd Longmire, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL BACKGROUND

### I. Pre-trial Proceedings

On March 31, 2000, Defendant's counsel filed a motion to reevaluate Defendant's competency to stand trial (which was scheduled to commence on April 11). During the motion hearing on April 3, 2000, Defendant's counsel informed the trial court that he filed the motion because Defendant had refused to talk to him or assist him in any way in preparing for the upcoming trial. Defendant responded that he had been previously evaluated twice and found competent each time and that his primary concern had to do with the competency of his attorney. Defendant requested that the court grant him permission to represent himself, and the trial court scheduled a hearing to determine whether this would be proper. The motion for reevaluation of Defendant's competency was denied.

Four days later, on April 7, 2000, a hearing took place for the trial court to determine whether Defendant should be allowed to represent himself at trial. During the proceeding, the following colloquy ensued:

| | |
|---|---|
| THE COURT: | Are you asking me again to allow you to let your appointed counsel go and you can represent yourself? |
| [DEFENDANT]: | Correct. |
| THE COURT: | I said something before that you are entitled to do that if you want to do that. |
| [DEFENDANT]: | I remember that. |
| THE COURT: | But I have to establish that you are making a knowing, intelligent waiver of your right to counsel and I also want to tell you that I am strongly trying to dissuade you from the action. |
| [DEFENDANT]: | Yes. |
| THE COURT: | But I am not going to deprive you of your right to try yourself if that is what you want to do. How old are you? Raise your right hand, please. |

(WHEREUPON, MR. HOPSON WAS DULY SWORN BY THE COURT.)

THE COURT:       Okay. You will need to speak up good and loud because you are on the record. State your name for the record.

[DEFENDANT]:       Ralph Taylor Hopson.

THE COURT:       Mr. Hopson, you are under indictment for second degree murder and attempted first [sic] degree murder, is that right?

[DEFENDANT]:       Correct.

THE COURT:       And your case is scheduled for trial on the 11th of April, is that right?

[DEFENDANT]:       That is correct.

THE COURT:       And you have indicated here today that you do not want to have the attorneys that work for the Public Defender's office representing you, is that right?

[DEFENDANT]:       That is correct.

THE COURT:       Can you tell me - how old are you?

[DEFENDANT]:       Forty-three (43).

THE COURT:       And how much formal education do you have?

[DEFENDANT]:       Approximately fourteen (14) years of education.

THE COURT:       Okay. You have received a degree in high school, is that right?

[DEFENDANT]:       Correct.

THE COURT:       And you have some post-graduate academics, is that right?

[DEFENDANT]:       Correct.

THE COURT:       Have you ever studied law in any way?

[DEFENDANT]:       Nothing but within the jail, no.

THE COURT: Have you ever been represented by counsel at any point in a criminal procedure?

[DEFENDANT]: Yes.

THE COURT: Do you understand that there are rules of practice in a courtroom and there are certain rules that I have in this courtroom concerning the way that you try cases in court?

[DEFENDANT]: I understand.

THE COURT: Have you ever seen the rules of practice in this courtroom?

[DEFENDANT]: No.

THE COURT: Okay. Well, I will have you some prepared and you can keep those. You have never tried a case yourself, have you, on behalf of you?

[DEFENDANT]: Yes sir, I have.

THE COURT: And was that here in this court, or was that in another?

[DEFENDANT]: Another court in _____ County [sic], General Sessions Court.

THE COURT: So, you are familiar with the settings in the courtroom, the people who are involved?

[DEFENDANT]: Yes.

THE COURT: You understand that the State of Tennessee will be represented by at least one Assistant Attorney General?

[DEFENDANT]: I do.

THE COURT: And they are not on your side?

[DEFENDANT]: No, I understand that.

THE COURT: Their--in fact, it is their job to try and convict you, you understand that?

[DEFENDANT]: I understand.

THE COURT: You have appointed counsel as of now, Mr. Herman, who represents the Public Defender's Office for you. You understand that as a matter of law, constitutional and statutory, they are there to help you, to look out for your interest? And can you speak up?

[DEFENDANT]: I understand completely.

THE COURT: Have you considered the possibility that you will be facing a jury without the benefit of any legal training whatsoever?

[DEFENDANT]: Yes, I do.

THE COURT: Are you under the influence of any alcohol, drug or medication here today?

[DEFENDANT]: No.

THE COURT: Are any - are you under any type of any threat - has anyone tried to coerce you, or force you into this process of essentially firing your lawyer?

[DEFENDANT]: No.

THE COURT: You are doing this on your own free-will?

[DEFENDANT]: Correct.

THE COURT: You have been forensically evaluated?

[DEFENDANT]: I have.

THE COURT: And your forensic evaluation shows that you were not incompetent and that you were sane at the time of the offense, is that correct?

[DEFENDANT]: That's correct.

THE COURT: And you do agree with that assessment?

[DEFENDANT]: I sure do.

THE COURT: You mentioned that you had learned some law here in this jail--

[DEFENDANT]: Correct.

THE COURT: Was it this jail or another jail?

[DEFENDANT]: In this jail.

THE COURT: All right. So, you have had the opportunity to review what you are charged with, the elements?

[DEFENDANT]: Correct.

THE COURT: All right. I have no choice at this point but to find that you have knowingly, intelligently waived your right to counsel, and that you are going to be allowed to represent yourself at trial. I am going to appoint the Public Defender's Office to act as elbow counsel for you, which means they will not be saying anything on your behalf. You will do all of the talking, you will do all of the presentations, you will do everything in terms of courtroom work. They will be there to assist you, and explain rulings that I may make or procedures that involve nothing of their interference or interruption in this trial, do you understand that?

[DEFENDANT]: I understand.

*  *  *

[THE COURT]: Okay. All right. This case is scheduled for trial Tuesday morning. Mr. Herman, your office will act as elbow counsel. If you need some clarification what that means, I will be happy to make you--I will bring you up to speed on that. But essentially you will not assist in the presentation of evidence, you will not assist in jury selection. If Mr. Hopson has any questions that he wants to ask you throughout the trial, he can ask you. If he doesn't want to ask you anything, then you are setting mutual [sic]. Okay. And I--and that would include the remainder of your office, as far as their availability.

[MR. HERMAN]: I understand.

-6-

[THE COURT]: . . . I will tell you, I don't like doing it, I don't like doing this and I will take a very proactive part in this trial, but you will be given a fair trial. All right.

At the conclusion of the above conversation, the trial court found that Defendant had "knowingly and voluntarily waived his right to a lawyer." The trial court followed with a cautionary remark to Defendant that he was in his " own shoes at that point" and that the Rules of Evidence and of Criminal Procedure applied to him "the same as they would an attorney," which was one of the "pitfalls" of self-representation.

## II. The Trial

The trial commenced as scheduled on April 11, 2000. The following facts concerning the commission of the crimes for which Defendant was convicted were taken from the proof presented by the State at that time. At approximately 5:00 p.m. on May 3, 1999, the Claiborne County Sheriff's Department received a 911 emergency call from a woman named Patty Johnson in an area known as Howard's Quarter off of Highway 33. Officer Phillip Johnson arrived at the scene simultaneously with an ambulance from the Claiborne County Ambulance Service and Officer Tom Daughtery, also with the Claiborne County Sheriff's Department. As Officer Johnson approached, he observed Patty Johnson and several other persons flagging him down from the side of the highway. He pulled up next to them and discovered a woman, later identified as Gertie Amos, lying on the road. Amos had suffered two stab wounds, one in her left arm and the other in her chest. Blood was coming from both wounds. Amos informed Officer Johnson that Defendant had stabbed her. She pointed across the highway to a tobacco barn, where Defendant lived in a small room on the left side, and told him that Defendant was still inside.

Officer Johnson, along with two additional officers, walked to within fifty feet of the barn door and identified themselves with a loudspeaker. The officers also asked Defendant to come out of the barn and talk with them about Gertie Amos. They received no response. Other officers arrived, and some of the other officers attempted to coax Defendant outside without success. Approximately one hour and forty-five minutes later, Officer Johnson walked up to the barn and peered inside through some cracks in the wall. He observed the body of a male lying on the ground in front of a wagon.

Officer Johnson and some of the other officers entered the barn. Initially, the officers believed that the man observed lying on the ground was Defendant. However, the wallet and driver's license recovered from the body revealed the person to be Randall Barnard. He was dead. The officers immediately took cover and again called out for Defendant to reveal himself. There was no response. One of the officers forced open a door on the left side of the barn which had been locked. Officer Johnson entered first and discovered Defendant lying on his back on a bed, with his hands behind his head. According to Officer Johnson, Defendant was looking straight at him when he entered the room. Within an arm's reach of Defendant's hand was a "XX" knife with a brown handle and 3.5 to 4 inch blade. The weapon was covered in blood, which was later determined to

-7-

be of human origin. (The record does not reflect whether DNA tests were performed on this evidence.) The officers ordered Defendant to roll onto the floor and then escorted him outside. As Defendant walked past Barnard's body, which was lying face up, he asked the identity of the person.

The officers requested permission to search Defendant's room and he consented. As a result, the officers discovered a blue suitcase, a pillow case, a mattress cover, and a green shirt--all were covered with blood. Thereafter, Defendant was taken to the Claiborne County Sheriff's Department, where he was read his <u>Miranda</u> rights. Defendant signed a waiver of those rights and gave a statement. Officer Johnson testified at trial that, although Defendant smelled of alcohol, he appeared coherent and able to understand what was happening at that time.

Gertie Mae Amos, thirty-one years old, testified that she had known Defendant for approximately ten to fifteen years and had known the deceased victim "for years." Amos claimed that she spent the night prior to the incident at Defendant's residence because her car was "messing up." The next morning, May 3, 1999, she and Defendant drove to the market to buy beer and then stopped by the home of the deceased victim, Randall Barnard. They drank beer for approximately an hour, then the three of them drove to Defendant's barn. Amos claimed that no arguments had occurred between any of them thus far.

Sometime after they arrived at Defendant's room in the barn, Amos and Barnard began talking about Amos' mother, who was deceased. Barnard suggested that the three of them take flowers to her grave someday. According to Amos, Defendant said that "he had heard her name mentioned in his house enough." He instructed the two of them to "get the hell out." When Barnard stood to leave, however, Defendant "jumped up and went towards him in the side with the knife." Amos testified that she was uncertain whether Defendant stabbed him, but she saw Barnard fall back onto the bed. Next, Defendant came toward Amos. He stabbed her in the left arm and said, "I am going to give you the same thing I gave your mother." Amos ran outside into the yard. Defendant followed her and stabbed her again in the breast. Amos testified that she fell to the ground and "played dead." Defendant called her a "bitch" and told her that she "had better lay there and die." When Defendant returned to the barn, Amos jumped up and ran to the highway to get help. Amos claimed that neither she nor Barnard ever threatened Defendant and that she had no idea why he would react adversely to Barnard's statement concerning her mother.

Patty Johnson, a second grade school teacher in Hancock County, testified that she was visiting a neighbor when she first observed Amos. Amos was coming from a driveway across the highway from the neighbor's house. Her shirt and pants were covered with blood. Amos told Johnson that "Ralph" had attacked her, and Johnson immediately dialed 911 for assistance.

Dr. Gretel Harlan, a forensic pathologist, testified that she performed an autopsy on the victim, Ralph Barnard. Dr. Harlan determined the cause of death in his case to be massive blood loss due to two stab wounds. One of the stab wounds, located on the upper chest, severed the ascending aorta, which usually causes a person to "bleed out" within a matter of minutes. Death occurs very quickly in such cases. The second stab wound punctured the sternum and entered the right pleural

cavity (where the right lung is located). This type of wound typically causes extreme pain, but not necessarily any major damage. Dr. Harlan further testified that the victim's blood alcohol (ethanol) level at the time of death was determined to be 0.36. The effects on the body at this level usually include stupor, slowed reaction time, inability to walk steadily, and blurred vision. In cases where the person is accustomed to drinking alcohol, the effects would be less severe than a person who drinks less frequently.

At the conclusion of Dr. Harlan's testimony, the State rested its case. Following a conference with his "elbow counsel," Defendant moved for a judgment of acquittal. The trial court denied the motion. Thereafter, Defendant informed the trial court that he preferred not to testify. He also declined to offer any proof in his defense. The State then gave its closing argument; Defendant chose to also forgo a closing argument. The trial court gave the jury its instructions, and it began deliberations. Twenty-four minutes later, the jury found Defendant guilty of the crimes charged.

### III. Sentencing Hearing

Defendant declined assistance of counsel for the sentencing hearing, which occurred on September 8, 2000. On behalf of the State, Gertie Amos testified that the injuries she received from Defendant affected her life, i.e., she was required to use a breathing machine at home and carry an inhaler with her everywhere she went. Amos claimed that the experience also affected her "nerves," but Defendant had not expressed any remorse to her or offered any compensation for her injuries. Vivian Edwards, the sister of the deceased victim, similarly testified that Defendant had failed to demonstrate any remorse or offer compensation in any form. In addition, Edwards claimed that the loss of her brother caused her family great sorrow and that the funeral arrangements had created a financial burden.

Thereafter, Defendant gave an unsworn statement to the effect that he was "sorry" and that he considered the incident unfortunate. He concluded by giving "advice to one and all," namely, to "leave alcohol and drugs alone because that's what caused it. You don't mix it. Leave it alone because that's what it wound up causing me to do." Defendant also expressed some remorse that "nothing can change [what happened]." Following Defendant's statement, the State requested an opportunity to cross-examine him. Defendant agreed. He was sworn in, and the State questioned him concerning whether he had any doubts about his decision to represent himself at trial. Defendant stated that he had no regrets about his choice to not (a) make an opening statement or a closing argument, (b) conduct direct or more extensive cross-examination of witnesses, (c) have assistance of counsel, or (d) submit defenses. Defendant also stated that, in his opinion, he had received a fair trial.

When the proof was concluded, the trial court reviewed certain "uncontroverted" facts with Defendant, i.e., that he was convicted of second degree murder, a Class A felony, for which the range of punishment was fifteen to twenty-five years, with the presumptive sentence at mid-range or twenty years; and the range of punishment for attempted second degree murder was eight to twelve years, at thirty percent release eligibility. Defendant acknowledged that he was aware of these facts and

that he understood them. The trial court also pointed out that an attorney from the public defender's office had been assigned as advisory counsel prior to trial and that he had been available to Defendant throughout the case and during every critical stage of the proceeding.

The State submitted seven enhancement factors for consideration by the trial court; three applied only to the attempt offense, and two applied only to the murder charge. The trial court asked Defendant whether he understood the purpose of the enhancement factors and whether he wished to confer with elbow counsel at that point. Defendant declined. The trial court explained to Defendant that there may be facts and circumstances which the court may consider to mitigate his sentence, i.e., things he may wish to present to the court which "work to his advantage" in that the court may find Defendant deserving of a lesser sentence. Defendant responded, "You done know the full set of circumstances already." The trial court explained to Defendant that although it was aware of the circumstances surrounding the particular crimes, it knew very little about him personally. Defendant chose not to give the trial court additional information. At this point, the trial court asked the Assistant Public Defender whether he knew of anything that might be helpful. The attorney replied that Defendant did not have an extensive criminal history and that two of the enhancement factors submitted by the State did not apply. Thereafter, the trial court made the following findings:

> Reviewing the enhancement factors, I do find there was more than one victim. Although there are two separate charges that cover two separate victims, I do believe that the spirit of that particular provision is reflective of the dangerousness of the situation that [Defendant] caused.

> I'm not particularly persuaded by the--the injuries inflicted were particularly great. Certainly they were on Mr. Barnard, but I think the General tended to point out, as to Ms. Amos, it would apply to her. I think that she has been hurt. But I think it is reflected within the charge, and I am not going to find that as a basis for enhancing the sentence or for raising above the presumptive minimum. I am going to find the defendant employed a deadly weapon during the commission of the offense.

> Reviewing the mitigating factors that might possibly be raised in this case, I don't find any evidence. I never heard any evidence nor argument that might draw a bead on any mitigating factors. So I do find that the remaining enhancing factors do outweigh the mitigating factors for purposes of justifying the sentence above the presumptive minimum.

The trial court then imposed a sentence of twenty-five years for the second degree murder conviction and ten years for the attempted second degree murder conviction. The court ordered the sentences to run concurrently, for an effective sentence of twenty-five years.

# ANALYSIS

## I. Waiver of Right to Counsel

Defendant contends that the trial court's inquiry as to whether Defendant should represent himself at trial was not sufficiently thorough to properly determine whether the waiver of his right to assistance of counsel was knowing and intelligent. Defendant contends that, under Smith v. State, 987 S.W.2d 871 (Tenn. Crim. App. 1998), a trial court is required to conduct an extensive inquiry as to a defendant's ability to represent himself in a criminal matter when he states his intention or desire to do so. Defendant maintains that without such inquiry, is it impossible to properly determine whether a defendant's waiver was constitutionally valid, and, in this case, the trial court's failure to follow the guidelines provided in Smith for such purpose effectively violated his right to counsel. He argues that his conviction should be reversed therefor. For the following reasons, we agree.

The right to assistance of counsel in the preparation and presentation of a defense to a criminal charge is grounded in both the Tennessee and United States Constitutions. See U.S. Const. amend. VI; Tenn. Const. art. I, § 9. There also exists an alternative right--the right to self representation--which is necessarily implied by the structure of the Sixth Amendment. Faretta v. California, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); State v. Northington, 667 S.W.2d 57, 60 (Tenn. 1984). "The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." Northington, 667 S.W.2d at 60 (quoting Faretta, 422 U.S. at 821-22, 95 S. Ct. at 2533).

The exercise of the right to self-representation depends, in large part, upon a knowing and intelligent waiver of the right to counsel. Id.; State v. Burkhart, 541 S.W.2d 365 (Tenn. 1976)); State v. Herrod, 754 S.W.2d 627, 629-630 (Tenn. Crim. App. 1988). Consequently, in cases where the accused states a desire to represent himself or herself at trial, the trial court has a duty to first determine whether the waiver is knowing and intelligent. In Johnson v. Zerbst, 304 U.S. 458, 465, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938), the United States Supreme Court placed "the serious and weighty responsibility . . . of determining whether there is an intelligent and competent waiver" directly upon the trial judge. More specific guidelines were subsequently established in Von Moltke v. Gillies, 332 U.S. 708, 723-724, 68 S. Ct. 316, 323, 92 L. Ed. 309 (1948), wherein the Supreme Court stated that

> [A] judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such waiver must be made *with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.* A judge can make certain that an accused's

professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered.

(Emphasis added.)

Similarly, Rule 44(a) of Tennessee's Rules of Criminal Procedure states the following:

Every indigent defendant shall be entitled to have counsel assigned in all matters necessary to the defense and at every stage of the proceedings, unless the defendant executes a written waiver. Before accepting such waiver the court shall first advise the accused in open court of the right to the aid of counsel at every stage of the proceedings. The court shall, at the same time, determine whether there has been a competent and intelligent waiver of such right by inquiring into the background, experience and conduct of the accused and such other matters as the court may deem appropriate. Any waiver accepted shall be spread upon the minutes of the court and made a part of the record of the cause.

Clearly, the trial court is obligated to conduct a fairly intensive investigation into the accused's ability to represent himself when the issue is raised. In Smith v. State, 987 S.W.2d 871 (Tenn. Crim. App. 1998), this Court recommended that in cases where a defendant aspires to proceed pro se, the trial court should conduct its inquiry in accordance with the guidelines contained in 1 Bench Book for United States District Judges 1.02-2 to -5 (3d ed.1986) (for ease of reference, the guidelines were reprinted in the appendix to Smith).

Defendant relies in large part on Smith (and the guidelines contained in its appendix) for his argument that the inquiry conducted by the trial court in his case was not sufficiently extensive to ensure that his waiver of the right to counsel was knowingly and intelligently made. According to the facts set forth in Smith, upon receiving notice that the defendant wanted to represent himself, the trial judge affirmed that he had that right and provided him with copies of the indictments against him. Id. at 872. Later, the defendant informed the trial judge that he had negotiated a plea agreement and wanted to waive his right to a jury trial. At this point, the trial judge asked him whether he was aware of his right to counsel and informed him that the court would appoint an attorney to assist with his defense if he could not afford one. The defendant waived those rights and restated his desire to proceed pro se. The trial judge accepted his waiver of the rights to assistance of counsel and a jury trial, and then inquired as to his age, education, physical and mental health. Id. at 873. The defendant answered the questions and stated that he was not under the influence of any intoxicants, at the time of the crime or that particular moment. The trial judge then advised the defendant of the maximum sentence length possible, found his guilty pleas voluntary, and imposed the agreed-upon sentences.

On appeal, a panel of this Court set aside the Smith defendant's conviction and remanded the cause for a new trial. The reversal was predicated on this Court's conclusion that, under the existing

guidelines, the trial court's pre-trial inquiry into the matter "should have been more extensive." Id. at 877. Specifically, the trial court's inquiry was found inadequate based upon the following: there were no warnings of the pitfalls of self-representation; the waiver was accepted without asking about the defendant's background, education, or experience with the court system; no questions were asked regarding his understanding of lesser offenses or the elements of the offenses charged; defendant was not asked whether he understood available defenses or the range of possible punishments; and, most importantly, the trial court failed to warn the defendant that self-representation was "unwise." Id. at 876.

A similar issue was presented in State v. Northington, 667 S.W.2d 57 (Tenn. 1984), wherein our supreme court held that the trial court had "'wholly failed' to properly investigate [whether] the defendant understood the consequences of self-representation in light of the Von Moltke factors." Id. at 61. In Northington, the facts in the opinion revealed that the trial court had discussed the seriousness of the charges; advised the defendant that, if he undertook to represent himself, he would be held to the same standard as a lawyer; ensured that the defendant had discussed the case with his appointed attorney; determined the age and education of the accused; and warned the defendant that proceeding pro se was unwise. Id. at 59. Notwithstanding these measures, our supreme court set aside the conviction because the trial court had "failed to diligently examine the defendant's background and experience, failed to notify defendant as to the possible extent of any penitentiary sentence, and failed to elaborate fully to defendant why he thought it 'unwise' to waive counsel." Id. at 61.

By contrast, a panel of this court found a valid waiver of the defendant's right to counsel in State v. Goodwin, 909 S.W.2d 35 (Tenn. Crim. App. 1995). In that case, the trial court inquired as to Goodwin's age and education; warned him that proceeding pro se would cause confusion; informed him that an attorney would be provided to assist him with pretrial proceedings and throughout the appellate process, if necessary; and cautioned him that he would not have access to a law library and that his advisory counsel was not required to provide him with copies of relevant legal materials. Id. at 40. The trial judge further informed him that the trial would proceed at the same pace as it would if he had appointed counsel, that he would not have an opportunity to confer with advisory counsel for every question, and that he was responsible for understanding the rules of evidence and local rules of court. Id. at 41. As a litigant, Goodwin was cautioned that he would have "no greater right than any other litigant," but treated the same as if he were represented by counsel. Id. On appeal, this Court found that the defendant had clearly demonstrated that "he knew what he needed to obtain to mount a defense and the problems that he would encounter." He had testified to previous experience with the judicial system and was also adamant that he represent himself at trial. Consequently, this court concluded that Goodwin "clearly understood the hazards of representing himself," and that he had sufficient knowledge of what he was getting into to knowingly and intelligently waive his right to counsel. Id. at 40-41.

Considering all of the above, we first find the trial judge's investigation insufficient to determine whether Defendant adequately understood the consequences of self-representation in light of the Von Moltke factors. The trial judge in Defendant's case did not ensure that the waiver was

made with an apprehension of the nature of the charges or of the lesser-included offenses included within them.  The trial judge stated the charged offenses and asked Defendant only whether he had an opportunity to review the elements--the range of allowable punishments thereunder was not mentioned.  The trial court did not go over the specific elements of the charged offenses or any lesser-included offenses.  In addition, the pre-trial inquiry contains no discussion of possible defenses to the charges or of what circumstances may be considered in mitigation thereof.  In short, the inquiry which should enable the judge to "make certain that an accused's professed waiver of counsel is understandingly and wisely made," fell short of being "penetrating and comprehensive of all the circumstances under which such a plea is tendered."  Von Moltke, 332 U.S. at 723-24.

Comparing relevant Tennessee case law to the case sub judice, we conclude that the trial court's inquiry more closely resembles the probes conducted in Northington and Smith, rather than Goodwin.   First and foremost, the warnings given Defendant concerning the "pitfalls" of self-representation were inadequate to sufficiently apprize Defendant of the hazards involved in such an enterprise.  Instead of enlightening Defendant as to precisely what types of hurdles he would encounter, as in Goodwin, the trial judge informed Defendant that he was "strongly trying to dissuade [him]" from representing himself," then failed to elaborate with any specifics.  The trial judge pointed out that the prosecutor would try to convict him and that he would be "facing a jury without benefit of any legal training whatsoever."  The trial judge cautioned Defendant that he would be in his "own shoes" during the trial, i.e., he would do all of the talking and presentations, and also be responsible for following the rules of procedure and evidence.

As for the inquiry into Defendant's background, education, and experience with the court system, the trial judge's questions were not diligent to the extent that it was evident Defendant had a broad understanding of the matter at hand.  In response to questions from the trial judge, Defendant stated that he was forty-three years of age and a high school graduate with some college.  He also claimed to have had some experience representing himself, but the trial judge did not question him further on this issue (the presentence investigation report reveals only one prior DUI conviction in 1999).  Defendant further confessed that he was essentially unfamiliar with any "rules of practice."  Similarly to Northington and Smith, no questions were asked regarding his understanding of lesser offenses, the elements of the offenses charged and their lesser-included offenses, the defenses available to him, or the range of possible punishments.

As previously noted, this Court has recommended that the trial judge question a defendant who wishes to proceed pro se according to the guidelines contained in 1 Bench Book for United States District Judges 1.02-2 to -5 (3d ed.1986).  For ease of reference, the guidelines were reprinted in the appendix to the Smith opinion, supra.  A thorough review of the suggested inquiries reveals that the trial judge in Defendant's case failed to ask a number of consequential questions. Questions (g) through (j), concerning familiarity with the various bodies of rules which are of significant importance to courtroom procedure and a just result, e.g., "Have you ever seen the rules of practice in this courtroom?" were of little value without follow-up inquiry.  Questions (d) and (e) deal with punishment: fines and consecutive sentencing, respectively.  These two issues are clearly important, but were left out by the trial judge.  Question (k), having to do with presentation of a defendant's

own testimony, was also disregarded. The questions in the guideline which were asked, left the issues undeveloped to any material extent. "A mere routine inquiry--the asking of several standard questions followed by the signing of a standard written waiver of counsel--may leave a judge entirely unaware of the facts essential to an informed decision that an accused has executed a valid waiver of his right to counsel." Von Moltke, 332 U.S. at 724, 68 S.Ct. at 323. The record reflects that a few issues which should have been addressed were raised to some degree at different points later in the trial or during the sentencing proceedings. However, "[a] valid waiver, if there is one, is made prior to trial or not at all." Northington, 667 S.W.2d at 62 (citation omitted).

The State contends that the trial judge's inquiry satisfied the constitutional requirements for a knowing and intelligent waiver of the right to counsel. The State cites no case law other than Smith for this argument, however. We therefore disagree with the State for the reasons stated herein.

We acknowledge that, at the sentencing hearing, the Defendant testified during cross-examination by the State, that he felt as though he had received a fair trial. Defendant also testified that he had no regrets about his choices to not make an opening statement or a closing argument, conduct direct examination of witnesses or more extensive cross-examination of State's witnesses, or to have assistance of counsel or to submit defenses to the charges. However, as noted above, in Northington, our supreme court stated that a valid waiver is made prior to trial or not at all. A defendant's belief at the time of his sentencing hearing that he received a fair trial does not negate the fact that he did not execute a "knowing and voluntary" waiver of his constitutional right to counsel prior to trial.

In conclusion, we find that the trial judge failed to determine whether Defendant's waiver of the right to assistance of counsel was knowing and intelligent, according to factors set forth in published opinions. As a result, the convictions must be reversed and the cases remanded for a new trial.

## II. Sentencing

Defendant also contends that the trial court erred in determining his sentence for the second degree murder conviction. His contention is based on the fact that the trial court gave him the maximum sentence for the murder conviction, and imposed a less than maximum sentence for his conviction of the attempt offense. We agree that the sentencing in this case was not determined properly, but our decision is based on other grounds.

When a defendant appeals the length, range, or manner of service of his or her sentence, it is this Court's duty to conduct a de novo review of the record with a presumption the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). The presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999). A defendant who challenges his or her sentence has the burden of proving the sentence

imposed by the trial court is improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments; State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

Although the trial court was not clear regarding what factors it applied to what offenses, it appears from the record that the trial court applied enhancement factor (3), appropriate where "[t]he offense involved more than one (1) victim," Tenn. Code Ann. § 40-35-114(3), and enhancement factor (9), appropriate where "[t]he defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense, id. § 40-35-114(9), to his sentences for both convictions. The trial court also considered applying enhancement factor (6), applicable where "[t]he personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great," id. § 40-35-114(6), but declined to do so because it believed serious bodily injury to be embodied in the two charges. As for mitigating factors, the trial court found none applicable.

The trial court erred in its use of enhancement factor (3), applied on the ground that there were more than one victim. The application of factor (3) is improper where the defendant is convicted of an offense that can only have one victim. State v. Imfeld, 70 S.W.3d 698, 706 (Tenn. 2002) ("there cannot be multiple victims for any one offense . . . committed against a specific, named victim"). Since Defendant was convicted for a separate offense (which could have only one victim) involving each named victim, use of this factor is inappropriate.

Enhancement factor (9) was clearly applied correctly, based on Defendant's use of a deadly weapon--in this case, a knife with a 3.5 to 4 inch blade. We note that the trial court erred in its comments concerning enhancement factor (6) as it relates to the attempted second degree murder conviction. The trial court determined this factor inapplicable to Defendant's sentence for the attempt offense because serious bodily injury was "reflected" in the charge. It is not. Neither is it an element of the offense. See Tenn. Code Ann. §§ 39-12-101, 39-13-210 (1997). Moreover, the serious nature of the injuries sustained by Gertie Amos were sufficiently proven at trial and at the sentencing hearing. Accordingly, factor (6) is applicable to the sentence for attempted second degree murder under the circumstances presented here.

Under the record presented, we find no mitigating factors applicable. This matter may be addressed, if necessary, after Defendant's new trial. Even if a new trial was not warranted in this case, the trial court's erroneous application of enhancement factor (3) and non-application of factor (6) would require that we remand the matter for a new sentencing hearing to apply the proper sentencing factors.

As a final matter, we shall address a number of discrepancies revealed during our review of the record. Counts 1 and 2, charging second degree murder and attempted second degree murder, respectively, each use the correct language in alleging the charge, but the statute code number is incorrect. Specifically, both counts cite the statutory number for first degree murder, Tenn. Code Ann. § 39-13-202, rather than second degree murder, Tenn. Code Ann. § 39-13-210. Likewise, the back side of the indictment contains an error: count 2 is noted as a charge of "Attempted first degree

murder," rather than "Attempted second degree murder." Therefore, the indictment should be amended to reflect the proper charge and statute code numbers.

## CONCLUSION

For the forgoing reasons, we reverse the judgment of the trial court and remand this matter for a new trial.

_____
THOMAS T. WOODALL, JUDGE